JUDGE BERMAN

STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel: (212) 490-4100
Bijan Amini (BA-3533)
Kathleen E. Wright (KW-5439)
Matthew Kane (MK-9645)
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
MACQUARIE ELECTRONICS USA, INC.,

                Plaintiff,

    -against –

BANK OF UTAH, as Indenture Trustee,

                Defendant.
-------------------------------------------------------------------

09 CIV _____

**COMPLAINT FOR
DECLARATORY AND
INJUNTIVE RELIEF
AND DAMAGES**

Plaintiff MACQUARIE ELECTRONICS USA, INC. ("Macquarie" or "Plaintiff"), by its counsel, Storch Amini & Munves PC, as and for its complaint against defendant Bank of Utah ("Defendant"), hereby alleges as follows:

1. This is an action for: (i) a declaratory judgment and injunctive relief arising from the existence of a justiciable controversy concerning the parties' rights and obligations under a Remarketing Agreement, and Joinder in Remarketing Agreement, dated September 28, 2007 and December 4, 2006, respectively (collectively, the "Remarketing Agreement"), and (ii) the Defendant's breach of that Remarketing Agreement.

## PARTIES

2. Plaintiff is a Delaware corporation and the owner participant ("Owner Participant") with respect to a certain Qimonda Leasing Trust (the "Trust") which, in turn, owns certain high technology 200 millimeter semiconductor manufacturing equipment located in Richmond, Virginia (the "Equipment").

3. Defendant is a Utah corporation which serves as the indenture trustee ("Indenture Trustee") for certain financing provided to acquire the Equipment.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is subject to the personal jurisdiction of this Court by consent pursuant to Sections 6.1 and 6.8 of the Remarketing Agreement.

## FACTUAL ALLEGATIONS

**Background**

6. Plaintiff, as part of the Macquarie Group, is a global provider of lease financing, equipment trading, used equipment sourcing and remarketing services to the semi-conductor manufacturing industry. In particular, Plaintiff is acknowledged as an industry expert in remarketing semiconductor manufacturing equipment. Plaintiff's business is supported by a global distribution network that maximizes the exposure and value of a seller's surplus assets, including a global customer data base, equipment analysis and valuation services, up-to-date

analysis of market demand, the expertise to oversee securing, de-commissioning and removal of such equipment and the ability to provide or secure financing for such transactions.

7. In addition, Plaintiff maintains an inventory of high technology equipment from which it can meet its customers' needs for specific machinery combinations and configurations, including semiconductor manufacturing equipment, from multiple sources.

**The Transaction**

8. Plaintiff, as Owner Participant, is the beneficial owner of the Trust which owns the Equipment. Wells Fargo Bank Northwest, N.A. ("Wells Fargo") is a national banking association that serves as the Plaintiff's owner trustee of the Trust ("Owner Trustee").

9. Plaintiff invested $48,614,812 in the purchase of the Equipment in two installments on September 28 and December 4, 2007. The remainder of the purchase price, or approximately $241,000,000, was financed through a transaction memorialized in a series of documents dated September 28, 2007 and December 4, 2007 (the "Transaction Documents").

10. The entities which provided the loan financing are a consortium of lenders defined in the Transaction Documents as the "Loan Participants."

11. On or about September 28, 2007 and December 4, 2007, Qimonda Richmond, LLC ("Qimonda"), Defendant as Indenture Trustee and Wells Fargo as Owner Trustee, entered into a sale and lease-back agreement ("the Transaction") pursuant to which Qimonda leased the Equipment from Wells Fargo as Lessor pursuant to an Equipment Lease Agreement (the "Lease").

12. Pursuant to a Trust Indenture and Security Agreement ("Indenture") between Wells Fargo, as Owner Trustee, and Defendant, as Indenture Trustee, the Owner Trustee granted Defendant a first priority security interest in the Equipment and the Lease was assigned to the

Indenture Trustee. Pursuant to the Indenture, the Indenture Trustee acts only on the instructions of the Loan Participants.

13. Again on or about September 28, 2007, Qimonda, Wells Fargo as Owner Trustee, Plaintiff as Owner Participant, Defendant as Indenture Trustee and the Loan Participants also entered into a Participation Agreement pursuant to which, among other things, Plaintiff has the right to buy out the outstanding debt to the Loan Participants and extinguish their security interest.

**The Remarketing Agreement**

14. In order to protect its substantial investment in the Equipment and mitigate the risk posed by the Transaction, Plaintiff demanded and obtained the Remarketing Agreement, also entered into initially on September 28, 2007, between Defendant, as "the Indenture Trustee on behalf of the Loan Participants," and Plaintiff.

15. Under the Remarketing Agreement, Defendant appointed Plaintiff to act as the Indenture Trustee's "agent and exclusive remarketer of the Equipment" for an exclusive period of 180 days beginning on a date upon which the Indenture Trustee is in a position to sell the Equipment. Among other circumstances provided for in the Transaction Documents, such an event is triggered whenever Qimonda defaults under the Lease.

16. Plaintiff is required under the Remarketing Agreement to perform remarketing activities in a commercially reasonable manner consistent with prudent industry standards so as to obtain the highest possible bids for the Equipment.

17. Plaintiff has the exclusive right under the Remarketing Agreement, for at least 180 days, to direct the resale process. The Indenture Trustee, with the consent of the Loan

Participants, makes the final decision as to whether to accept any bids resulting from Plaintiff's remarketing efforts.

18. As exclusive agent for sale of the Equipment, Plaintiff also acquires knowledge of prospective purchasers' demand and price requirements, as well as the Loan Participants' counter-offers or acceptances of any bids. Such information affords Plaintiff the opportunity to submit its own offer should it choose to do so. While Plaintiff has no obligation under the Remarketing Agreement to bid on the Equipment, there is nothing in the Transaction Documents, including the Remarketing Agreement, which prevents it from doing so. As part of its remarketing business, customers routinely call upon Macquarie to buy their equipment at discounted prices to clear excess assets.

19. The exclusivity afforded by the Remarketing Agreement also provides Macquarie with invaluable insight into the semiconductor manufacturing equipment resale market. Among other things, such information permits Plaintiff to pursue other sourcing and resale opportunities, maximize recoveries for itself and its clients and increase its market share and customer goodwill. In fact, the Remarketing Agreement acknowledges Plaintiff "may have equipment sourcing arrangements with prospective purchasers of Equipment" and that "the existence of such sourcing arrangements, and the performance of [Plaintiff] of the obligations under those sourcing arrangements, do not conflict with the obligations of [Plaintiff] under this Agreement." (§2.3). The Remarketing Agreement further provides that Plaintiff's "remarketing activities…will not be deemed to have priority over similar activities for [Plaintiff's] other customers." (§2.2).

20. Absent the Remarketing Agreement, Plaintiff would not have entered into the Transaction.

21.     Furthermore, there is no risk of detriment to Defendant in the Remarketing Agreement because, pursuant to its terms, Plaintiff has to submit all bids to the Indenture Trustee which alone can decide whether or not to accept a bid.

**Qimonda's Default And Subsequent Events**

22.     In or about January, 2009, Qimonda defaulted on payments due under the Lease. On February 20, 2009, Qimonda filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

23.     Qimonda's filing of the bankruptcy petition was an automatic Event of Default under Section 15(d) of the Lease. Under Section 16(b) of the Lease, this automatic default entitled the Indenture Trustee, as assignee of the Lease, to a variety of remedies, including: "with or without taking possession of the Equipment or any Unit, [to] sell, assign and convey in a commercially reasonable manner the Equipment of any Unit at a public or private sale."

24.     On May 6, 2009, the Delaware Bankruptcy Court issued an order granting Qimonda's request to reject the Lease.

25.     During the period between the filing of Qimonda's bankruptcy petition and Qimonda's rejection of the Lease, Plaintiff engaged in discussions with Dan Rouse ("Rouse"), a representative of Loan Participant AIG Commercial Equipment Finance, Inc. and member of the steering committee for the Loan Participants, who acted as the liaison between Plaintiff and the Loan Participants.

26.     During these discussions, Plaintiff advised that the costs of de-commissioning and removal of the Equipment would be approximately $24,000,000 and could take up to 6-9 months to complete. In addition, Plaintiff advised that the costs of maintaining the Equipment, during

that period, in an idle state could reach $10,000,000. Also during those discussions, Plaintiff was asked to submit a proposal to purchase the Equipment.

27. On a conference call with Plaintiff on or about April 16, 2009, Capstone Advisory Group ("Capstone"), financial advisors to the Loan Participants and the Indenture Trustee, advised Plaintiff that it had visited the Qimonda facility to review the cost of maintaining the Equipment idle. Qimonda estimated to Capstone that the cost would be $640,000-750,000 per month and Capstone subsequently indicated to Macquarie it agreed with the range of the estimated costs. Qimonda has demanded that Defendant dispose of, and until accomplished assume responsibility for the maintenance and the costs of storage of, the Equipment. The Remarketing Agreement, while permitting Defendant to preserve and protect the Equipment, expressly commands that Defendant "shall not attempt to sell, actually sell or otherwise deal with Equipment" in violation of Plaintiff's "exclusive right to remarket the Equipment." (§3.1).

28. In response to a request of the Loan Participants via Rouse, Plaintiff submitted a bid to the Indenture Trustee, through Rouse, on May 5, 2009, expressly without prejudice to its rights under the Remarketing Agreement. Rouse informed Plaintiff that the offer was rejected, but Rouse proposed that Plaintiff establish an auction process, outlined by Rouse, in which Plaintiff would act as the "stalking horse" bidder for the Equipment. Plaintiff submitted such a proposal to the Loan Participants on May 15, 2009, again expressly without prejudice to the Remarketing Agreement.

29. Even though the auction proposal was made at the express request of the Loan Participants on terms outlined by their representative, Rouse, the auction proposal was also rejected. On May 29, 2009, Rouse provided Plaintiff with a copy of a Request for Bids, dated May 28, 2009, pursuant to which, Defendant, as Indenture Trustee, purports to be directly

seeking bids for the Equipment. Capstone is designated in the Request for Bids as the solicitation agent for the bids.

30. On the same date, May 29, 2009, the Indenture Trustee filed a Proof of Claim in the amount of $253,968,436.03 seeking recovery of an amount which far exceeds the principal amount outstanding under the Indenture which is approximately $169,000,000. Although the Debtor, Qimonda, is believed to be insolvent, it is expected to pay a substantial dividend to the Indenture Trustee, and thus Loan Participants, following liquidation of its remaining assets.

31. Plaintiff subsequently learned that the Indenture Trustee's Request for Bids had been widely distributed on June 3, 2009 via an email from one of the Loan Participants, GE Capital Corporation ("GECC"), which is the main direct competitor of Plaintiff in the semiconductor machinery industry.[1] The recipients of the GECC email are either existing customers or potential customers of Plaintiff.

32. Following the distribution of the Request for Bids, in a conversation between Plaintiff's sales personnel and an individual representing an entity that is a potential bidder for the Equipment, that individual indicated that there was confusion in the market because they believed Plaintiff to be the owner/lessor of the Equipment and the entity responsible for remarketing it. Plaintiff learned from these potential bidders that they were unable to obtain necessary information on the specifications of the Equipment even from personnel at the Qimonda location purportedly acting for the solicitation agent.

33. The Request for Bids does not include the information and specifications that are necessary and customarily provided in detailed data sheets for successfully remarketing such high technology, high individual valued machinery as the Equipment. The Request for Bids also requires bidders to bid for 100% of the Equipment in cash and also requires the successful bidder

---

[1] GECC became a Loan Participant upon acquiring the Merrill Lynch Capital, an original Loan Participant.

to be responsible for the de-installation and removal of the Equipment without giving any notice of the likely cost and length of time this will require. The manner in which Defendant and Loan Participants are attempting to remarket the Equipment almost ensures that the maximum potential resale amount for the Equipment will not be achieved.

34. Defendant and/or Qimonda are requiring all potential bidders to sign a non-disclosure agreement that appears to prevent them from talking to Plaintiff about the Equipment. Thus, Defendant has deliberately and willfully excluded Plaintiff from its efforts to remarket the Equipment despite the fact that it is obligated, under the Remarketing Agreement, to remarket the Equipment through Plaintiff for an exclusive period after the Indenture Trustee resolved to sell it.

35. In addition, Defendant is willfully preventing Plaintiff from discussing the Equipment with potential bidders, including Plaintiff's own customers and its usual contacts in the industry in which it is an acknowledged expert.

36. On June 5, 2009, Plaintiff wrote to Defendant objecting to Request for Bids on the basis that the sale of the Equipment through that process violates Plaintiff's rights under the Remarketing Agreement Defendant did not respond to Plaintiff.

37. Instead, Defendant's attorney wrote to Plaintiff's attorney on June 15, 2009 asserting that the Commencement Date of Plaintiff's exclusive right to remarket under the Remarketing Agreement had not been triggered because the Indenture Trustee has not terminated the Lease, foreclosed on the Equipment, taken possession and served notice of such on Plaintiff.

38. Defendant's denial that these conditions have occurred as a result of Qimonda's default, the rejection of the Lease, Defendant's engagement of Capstone to remarket the Equipment, and the solicitation of buyers for the Equipment, clearly demonstrate Defendant's

willful abandonment of the Remarketing Agreement. Defendant's deliberate refusal to acknowledge these events or, assuming without conceding, that one or more of such events has not happened, failure to take the ministerial steps needed to assure they do, is further evidence of Defendant's bad faith and deliberate decision to breach the Remarketing Agreement.

39. Defendant is fully aware that, in the current market, Plaintiff is probably the only market participant with the ability to purchase all of the Equipment.

40. Defendant has, therefore, deliberately asked Plaintiff to bid on the Equipment in order to set a benchmark price and then, by circumventing the Remarketing Agreement, force Plaintiff to bid against itself to preserve its investment and market position. All of this is to the express detriment of Plaintiff and benefit to Defendant and Plaintiff's competitor, GECC.

41. This is precisely the situation Plaintiff sought to avoid by negotiating the Remarketing Agreement. Only by being able to view all bids can Plaintiff make a fully informed decision on whether to bid on the Equipment following Qimonda's default.

42. That Defendant is now unhappy with the Remarketing Agreement it entered into is no basis for it to dishonor its agreement.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Injunctive Relief)

43. Plaintiff hereby repeats and realleges each and every allegation contained in all of the foregoing paragraphs as if the same were set forth fully herein.

44. As a result of the forgoing, there is a justiciable controversy between Plaintiff and Defendants with respect to the rights and obligations of the parties under the Remarketing Agreement and Plaintiff is entitled to a declaration that the Remarketing Agreement is in effect and Plaintiff has the exclusive right under the Remarketing Agreement to remarket the

10

Equipment for a period of 180 days the commencement of which period is tolled while this lawsuit is pending.

45. Also, in order to prevent Plaintiff from suffering irreparable harm to its reputation, customer goodwill and business opportunities for which there is no adequate remedy at law, Defendant must be enjoined from attempting to sell or remarket the Equipment while this lawsuit is pending.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

46. Plaintiff hereby repeats and realleges each and every allegation contained in all of the foregoing paragraphs as if the same were set forth fully herein.

47. To the extent required, Plaintiff has performed its obligations under the Remarketing Agreement.

48. As a result of its willful misconduct, as set forth above, Defendant has breached Sections 1.1 and 3.1 of the Remarketing Agreement and the implied covenant of good faith and fair dealing, thus, denying Plaintiff the benefits for which it bargained.

49. As a result of Defendant' breach of contract, Plaintiff has suffered damages as follows:

   a. loss of reputation and position in the market place;

   b. loss of business opportunities and ability to expand its business;

   c. loss of customer goodwill; and

   d. in an amount that cannot now be calculated but believed to be substantially in excess of $100,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.  Permanently enjoining Defendant from attempting to sell or remarket the Equipment while the Remarketing Agreement is in effect;

B.  On the First Claim For Relief, declaring that the Remarketing Agreement is in effect and that Plaintiff has the exclusive right to remarket the "Equipment" for a period of 180 days, the commencement of which period is tolled while this lawsuit is pending, and permanently enjoining Defendant from attempting to sell or remarket the Equipment during that period;

C.  Ordering that Defendant immediately provide to Plaintiff a complete list of the entities and/or individuals involved in remarketing the Equipment, since January 2009, and a list of all entities or individuals invited to bid on the Equipment, together with all communications, bids or other information related to the Equipment with or related to such entities and/or individuals;

D.  On the Second Claim for Relief, damages in an amount to be determined at trial but at least in the amount of $100,000 together with interest thereon;

E.  Awarding Plaintiff reimbursement of all of its costs in bringing this action, including reasonable attorneys' fees; and

   F. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
    June 29, 2009

                   Respectfully submitted,
                   STORCH AMINI & MUNVES PC

                   _____
                   Bijan Amini (BA-3533)
                   Kathleen E. Wright (KW-5439)
                   Matthew Kane (MK-9645)
                   Two Grand Central Tower
                   140 E. 45th Street, 25th Floor
                   New York, New York 10017
                   Tel: (212) 490-4100